# UNITED STATES COURT OF APPEALS

for the First Circuit

Appeal Case No. 26-1770

Kyrpych et al,

*Plaintiff-Appellant*

v.

Kelly et al,

*Defendants-Appellees*

On Appeal from the United States District Court for the District of Massachusetts, Case No: 1:25-cv-12291-FDS

## MOTION FOR LEAVE TO FILE SUPPLEMENTAL TO APPELLANT'S OPENING BRIEF AND VERIFIED FACTUAL APPENDIX

The Appellant, Yaroslav Kyrpych, pro se, respectfully moving this Court pursuant to Federal Rules of Appellate Procedure and Circuit practice for leave to file the attached Supplemental Opening Brief and accompanying Verified Factual Appendix.. In support thereof, Appellant states as follows:

1. **Purpose and Scope of the Supplemental Brief**: This proposed supplemental brief provides essential structural clarity, factual particularization, and case-law analysis directly addressing the jurisdictional boundaries of the *Rooker-Feldman* doctrine, specifically distinguishing the post-*ExxonMobil* authorities invoked by the District Court (*DuLaurence v. Telegen*) from independent executive torts and constitutional violations outside state judicial authority, anchored by P*uerto Ricans for Puerto Rico Party v. Dalmau, 544 F.3d 58 (1st Cir. 2008)* and *Feinberg v. Diamant, 378 Mass. 131*. To maintain a concise, rule-compliant legal brief, Appellant has segregated the comprehensive historical record of the underlying executive conspiracy, evidence fabrication, and administrative blockading into an attached Verified Factual Appendix.
2. **Good Cause and Absence of Prejudice**: This filing builds directly upon Appellant's prior submissions (including the filing dated September 20, 2026) and ensures that the appellate panel has a complete, precise record of the factual predicate and legal distinctions separating independent federal civil rights claims from prohibited collateral attacks on state judgments, without prejudicing any party or disrupting the briefing schedule. Granting leave to file this brief will not prejudice any party or disrupt the appellate briefing schedule, as it crystalizes legal arguments and factual parameters already foundational to Appellant's core theory of relief under *Doe v. Spears*, *Patsy v. Board of Regents*, and *Puerto Ricans for Puerto Rico Party v. Dalmau*.

WHEREFORE, Appellant respectfully requests that this Court grant leave to file the attached Supplemental Opening Brief and Verified Factual Appendix.

Dated: September 30, 2026

Respectfully submitted,

/s/ YAROSLAV KYRPYCH

Plaintiff-Appellant Pro Se

228 Hilltop Dr,

Walpole, MA 02081

yaroslav.kyrpych@gmail.com

857-869-0080

## PROPOSED SUPPLEMENTAL TO OPENING BRIEF

This supplement explains and details a pay-to-play enterprise operating in Norfolk County, wherein attorney Kara Carey, sole owner of Ryan Faenza Carey P.C., secures and sells predetermined judicial rulings.

Under the judicial authority of Judge Lee M. Peterson at the Norfolk Probate and Family Court, Carey orchestrated a collusion scheme involving Norfolk Assistant District Attorneys Christine McMahon Cullinan and Anne S. Yas, key DCF Waltham personnel (Elise M. Barry, Shannon McAnulty, Sandra Fontecchio, Katheryn L. Butterfield, and Alison C. Coleman-Hardy), Walpole Police Detective Taylor Bethoney, and SD Family Services Inc. (Premela Deck and GAL Meghan Honigman).

By falsifying state assessments, concealing exonerating forensic findings, and committing fraud on both the Norfolk Probate and Family Court and the Wrentham District Court, Carey and her co-conspirators systematically deprived the Plaintiff of constitutional due process to deliver pre-arranged outcomes.

## I. FACTUAL BACKGROUND: THE ORCHESTRATED SCHEME, FINANCIAL EXTRACTION, AND EVIDENCE SUPPRESSION

Opposing counsel attempts to mischaracterize this appeal as a routine domestic dispute and mere dissatisfaction with a family court ruling. Opposing counsel falsely asserts that Appellant is merely attacking the judicial judgment itself; in truth, **judgment follows the evidence**, and Appellant is directly challenging the out-of-court fabricated evidence that was corruptly injected into Walpole Police Department records, DCF files, and Norfolk Probate and Family Court records. The factual record, however, establishes a calculated, top-down scheme involving financial extraction, evidence fabrication, clinical fraud, and systemic administrative obstruction. The operation depended on high-level judicial and prosecutorial control, executed through coordinated state and private actors.

1. **Systemic Architects, Financial Brokers, Customers, and Front-Line Executors**

   The fabrication of the record operated as a structured, top-down enterprise requiring deep knowledge of court mechanics, prosecutorial shielding, private financial extraction, and ground-level document fabrication:

a. **The Systemic Architects**: Judge Lee M. Peterson from Norfolk County Probate and Family Court and Norfolk County DA Office ADAs Christine Cullinan and Anne Yas functioned as the controlling minds of the scheme. They leveraged their judicial and prosecutorial authority to direct the outcome and ensure the fabricated record would be accepted without standard judicial challenge.

b. **The Financial Conduit, "Court Fixer", and Marketing Agent**: Operating as the functional bridge between the systemic architects and private capital, private attorney Kara Carey served as a court fixer, financial clearinghouse, and marketing agent for the scheme. Carey actively monetizes her influence and advertises her direct connections to DCF, the Norfolk Probate and Family Court, and the broader judicial system across her firm's official web and social media presence—including her X (Twitter) handle (@rfclegal) and Facebook business pages (@RFCAttorneys and @RFCLaw)—to solicit customers seeking favorable, predetermined outcomes. Because the judicial outcome was predetermined, Carey's function was not legitimate advocacy, but rather extracting funds, marketing corrupt access, steering key appointments (such as GAL Honigman to SD Family Services Inc), and selectively shielding front-line actors during discovery.

c. **The Customers (Private Beneficiaries):** Carolyn P. Gannon, Brian P. Divasta, Brian J. Gannon, and Donna F. Gannon functioned as the private funding source and direct beneficiaries of the enterprise. This group paid in excess of $150,000 to Kara Carey—including **$40,000 funded by Divasta** and **$90,000 funded by Gannon's parents (Brian J. Gannon and Donna F. Gannon)**—to secure a guaranteed, favorable result in family court without regard to truth, evidence, or actual child welfare considerations.

d. **The Front-Line Executors and Specific Fabrications:** To manufacture the physical evidentiary record, the architects and Carey utilized front-line operational actors across law enforcement, the GAL entity, and DCF:

- **Walpole Police Department Detective Taylor Bethoney:** Submitted falsified affidavits twice to Wrentham District Court under the direction of ADAs Cullinan and Yas to secure search warrants. Falsified an official police report

by deliberately suppressing exonerating evidence from a March 29, 2023 home search that completely cleared the Appellant. Bethoney forwarded these falsified police report to DCF response worker McAnulty to serve as the necessary evidentiary basis for agency action.

- **DCF response worker McAnulty and her supervisor Cheryl Banks:** Fabricated a supported 51B report dated April 5, 2023, relying directly on Detective Bethoney's falsified police report as her sole evidentiary basis—a 51B report that could not have been supported without Bethoney's underlying falsification.

- **GAL Meghan Honigman:** Fabricated a GAL report through her part-time work for SD Family Services Inc. under non-party co-conspirator Premela Deck by inventing an expert consultation with Dr. Shapse, executing a "clinical inversion" to pathologize the Plaintiff while scrubbing his "well-functioning parent" verdict, and systematically suppressing documented child physical injuries, the Carolyn P. Gannon's polypharmacy/instability admissions, and DiVasta's .41 BAC child endangerment felony conviction.

- **DCF response worker Elise M. Barry and her supervisor Michelle F Frazer:** Fabricated a supported 51B report dated February 8, 2023.

- **DCF Caseworker Danielle Czekanski (nee Simmer) and her supervisor Cheryl Banks:** Attempted to fabricate a 51B report dated June 22, 2023 but failed.

- **DCF ongoing worker Sandra Fontecchio, her direct Supervisor Steven Ruscio and ultimate Supervisor Alison C Coleman-Hardy:** Jointly fabricated the official Family Assessment and Family Action Plan, while Fontecchio independently fabricated official agency dictation notes to support the false narrative.

- **DCF Administrative Screeners (Muriel Peterson, Laura Rafael, Azelene Edouarzin, Katheryn L. Butterfield, Alison Coleman-Hardy, and Michelle F. Frazer):** Systematically breached their mandatory M.G.L. c. 119,

§ 51B duties by executing bad-faith "screen-outs" of fresh 51A abuse reports—including child disclosures of sexualized disinhibition and mandated-reporter reports of physical shaking—using stale data and divorce litigation as pretext, creating a state-created danger that directly enabled the Younger Daughter's broken wrist on January 12, 2023.

e. **Clinical Fraud and Record Sanitization:** These front-line actors manufactured a false narrative against the Appellant while simultaneously committing clinical fraud by sanitizing the official record to conceal active, documented substance abuse by Carolyn P. Gannon. Presenting this falsified clinical profile alongside the fabricated 51B reports provided Judge Peterson with the formal pretext to issue her predetermined ruling.

2. **Financial Extraction, Selective Discovery, and Steering of the GAL Appointment**

The financial engine of this enterprise operated through private attorney Kara Carey, who served as a financial clearinghouse extracting unearned legal fees based on a guaranteed, predetermined ruling:

a. **Extraction of Funds Without Adversarial Need:** The customer group—Carolyn P. Gannon, Brian P. Divasta, and Gannon's parents (Brian J. Gannon and Donna F. Gannon)—paid in excess of $150,000 in legal fees to Kara Carey. Carolyn Gannon faced no allegations or adverse claims that warranted such expenditure; these funds served as the private financial incentive driving the coordinated scheme.

b. **Calculated Non-Participation in Discovery (3 of 18 Depositions):** Across the entire litigation, 18 depositions were taken. Carey and her firm attended only **three**. Because the family court outcome was already locked in by the scheme's architects, Carey completely ignored 15 depositions—**including that of DCF caseworker McAnulty, the author of the fabricated April 5, 2023 supported 51B report.**

c. **Targeted Deposition Shielding:** Carey's firm rare attendance was strictly confined to managing and protecting two primary executing figures: DCF caseworker Sandra Fontecchio (whom Carey directly guided and shielded) and GAL Honigman.

d. **Manufactured GAL Selection via Radical Qualification Disparity:** To guarantee a controlled evaluation, Carey and Judge Peterson bypassed the Appellant's proposed expert, Dr. John Daignault—a licensed clinical psychologist (PsyD) with **35 years of specialized experience** evaluating children as a court-appointed GAL. Instead, Judge Peterson appointed Honigman, a candidate less qualified by a staggering margin: a licensed clinical social worker (LICSW) with **zero prior GAL experience**, employed full-time in veterans court, whose entire clinical background with children consisted of a single 2007 internship, and who performed GAL evaluations merely as a part-time side gig. Passing over a 35-year doctoral veteran in favor of an unqualified, part-time novice demonstrates that credentialing and child welfare were disregarded to steer the appointment directly to a collusive entity.

e. **The Interlocking Private Entity:** Honigman executed this part-time GAL assignment through SD Family Services Inc., an entity owned by non-party co-conspirator Premela Deck. Deck maintained a direct collusive connection with Carey, ensuring that the unqualified, part-time GAL was funneled through Deck's firm to produce a manufactured report aligned with the predetermined outcome.

3. **The Objective Exposure in the State District Court**

The falsity of the narrative leveraged in the Norfolk Probate and Family Court was formally exposed in a separate judicial forum: the Wrentham District Court (*In the Matter of Search Warrant No. 23SW0092*). During a September 15, 2023 hearing before the Honorable Julieann Hernon, the Norfolk District Attorney's Office made explicit, on-the-record concessions that directly shattered the evidentiary predicate used to deprive Appellant of his parental rights. Before the criminal court—where evidentiary rules, constitutional protections, and prosecutorial duties apply—the Commonwealth conceded under judicial questioning that:

a. **Concession of Zero Evidentiary Value:** The prosecution explicitly conceded on the record that forensic examination of the seized devices yielded no inculpatory evidence, prompting the return of all property.

b. **Absence of Criminal Charges**: The Assistant District Attorney confirmed to the Court that the investigation resulted in no findings of probable cause and that no criminal charges would be brought.

c. **Unsealing of Search Warrant Records**: The Commonwealth declined to oppose the motion to unseal, leading the Court to order the complete public un-impoundment of all search warrant documents.

Simultaneously, the exact same discredited allegations were allowed to linger unexamined in the Probate and Family Court to justify the ongoing, complete severance of Appellant's contact with his minor children. The District Court transcript demonstrates objectively that the family court record was anchored in an allegation that the state's own prosecutorial authorities admitted on the record was devoid of evidentiary foundation.

4. **Suppression of Evidence and Sabotage of the DCF Fair Hearing**

Norfolk County Assistant District Attorneys Christine Cullinan and Anne S. Yas deliberately paralyzed Appellant's statutory administrative process for a singular purpose: review of the SAIN interview and the fabricated 51B report would reveal and collapse their entire enterprise of executing and selling pre-determined outcomes.

a. **Administrative Order for Full Record Disclosure**: Appellant pursued a statutory DCF Fair Hearing to challenge the supported 51B findings. Recognizing that the entire administrative finding rested on assertions regarding the minor children's SAIN (Sexual Abuse Intervention Network) interviews, DCF formally ordered the release of the complete administrative file—specifically including the SAIN interview recordings—to Appellant for use at the hearing.

b. **Falsification of the SAIN Interview Narratives**: The SAIN interview recordings represent the *sole* purported evidentiary basis for the supported 51B finding. However, investigators (including Bethoney and McAnulty) materially falsified the substance of the children's actual statements in their written 51B and police reports, inventing a narrative that did not exist in the recordings to fabricate an evidentiary predicate.

c. **Prosecutorial Blockade Across Five Scheduled Hearings**: To prevent the exposure of this administrative fraud before a Fair Hearing officer, the Norfolk District Attorney's Office (including ADAs Cullinan and Yas) asserted control over the SAIN recordings and unlawfully refused to release them. Leveraging various pretexts, state actors derailed and blocked **five consecutively scheduled Fair Hearings**—the last four being stonewalled explicitly through the refusal to comply with DCF's disclosure order regarding the SAIN videos.

d. **Structural Deprivation of Administrative Due Process**: By suppressing the core exculpatory evidence ordered disclosed by DCF, the prosecution and state actors structurally paralyzed the administrative appeal process. By denying Appellant access to the primary evidence needed to disprove the written summaries, state actors deprived Appellant of due process and prevented the unraveling of the fraudulent narrative.

5. **The Closed-Loop Mechanism: Post-Separation Priming and Institutional Alienation**

To sustain a manufactured record that would otherwise collapse under objective scrutiny, the enterprise operated a closed-loop system designed to program the minor children once they were isolated from Appellant:

a. **The Pre-Condition of Physical Separation**: Prior to their physical separation from Appellant, the minor children repeatedly refused to state sexual abuse allegations—a fact documented in the October 25, 2023 SAIN interview, Walpole Police Department reports, and Medfield Police Department reports. To overcome this lack of evidentiary predicate, DCF Caseworker Sandra Fontecchio initially recommended physically separating the children from Appellant and isolating them from the outside world specifically to extract disclosures—a measure enforced from March 13, 2023, through the March 22, 2023 SAIN interview. This manipulative scheme was explicitly acknowledged on March 20, 2023, when Carolyn P. Gannon admitted to DCF Caseworker Shannon McAnulty—as formally recorded in the April 5, 2023 Section 51B report—that physical separation was required because the children would not make sexual abuse claims while remaining in Appellant's care.

b. **State-Sponsored Child Priming via Norfolk DA / Bay State Community Services Joint Venture**: Following the April 5, 2023 supported Section 51B report and the enforcement of physical separation, state actors deployed Rachael Sullivan, a trauma specialist (not licensed at the time of involvement) with the Norfolk County District Attorney's Office Child Trauma Team. This team operates directly out of Bay State Community Services, Inc.—a state-sponsored joint venture and collaborative entity between the Norfolk DA's Office and DCF. Utilizing this institutional apparatus, Sullivan systematically primed the isolated children, employing techniques to instill false memories, persuade them they were victims of sexual abuse, and elicit retrofitted disclosures.

c. **Institutional Function of the Closed Loop**: This post-separation programming functioned as a mandatory, self-reinforcing loop within the enterprise. Because the initial Section 51B findings relied on falsified investigator summaries rather than genuine child disclosures, state actors had to program the children post-separation to align their statements with the fabricated narrative, thereby securing the predetermined custody outcome and preventing the entire scheme from unraveling.

## II. THE DISTRICT COURT'S POST-EXXONMOBIL CITATIONS UNIFORMLY INVOLVE DIRECT ATTACKS, NOT INDEPENDENT CLAIMS (CONTINUED)

Supplementing Appellant's prior analysis submitted on September 20, 2026—which addressed the core body of case law invoked by District Judge Saylor in his memorandum of dismissal—Appellant further demonstrates that the remaining authorities cited by the District Court are entirely inapposite. Specifically, *DuLaurence* and similar decisions target direct attacks on competent judgments, whereas this action advances distinct, independent constitutional torts outside state judicial authority:

### *1. Dulaurence v. Telegen is inapposite; plaintiff's action targets independent executive torts rather than an impermissible attack on a state judgment*

The District Court's reliance on ***DuLaurence v. Telegen*, 94 F. Supp. 3d 73 (D. Mass. 2015), *aff'd*, No. 15-1537, 2016 WL 10454553 (1st Cir. Nov. 30, 2016)**, ignores a fatal structural distinction: the federal plaintiff in *DuLaurence* brought no independent, pre-

adjudication constitutional tort claims against executive agencies. Instead, *DuLaurence* was a direct collateral attack on state-court judgments and anti-SLAPP rulings where the state tribunal (Massachusetts Superior Court) actually possessed explicit, plenary subject-matter jurisdiction over the exact employment and litigation conduct it reviewed. The federal plaintiff in *DuLaurence* explicitly sought to declare those authorized state adjudications void and recover damages premised entirely on the theory that adverse rulings within the litigation were procured via discovery withholding and misleading statements. *Id.* at 73.

Here, by contrast, the Probate and Family Court possesses zero statutory jurisdiction or authority to adjudicate DCF 51B administrative investigations, executive evidence fabrication, or police misconduct (*Feinberg v. Diamant*, 378 Mass. 131; M.G.L. c. 215, § 3). Because the family court lacked the legal competence to address these executive torts, Plaintiff's federal action cannot logically constitute a "review" or "rejection" of a prior judicial determination on these matters.

Because Plaintiff's injuries stem directly from the independent, unconstitutional conduct of executive agencies rather than from an authorized state judicial adjudication, *DuLaurence* has no application, and this Court retains full subject-matter jurisdiction.

## III. *ROOKER-FELDMAN* INAPPLICABILITY AND INDEPENDENT EXECUTIVE TORT JURISDICTION (*PUERTO RICANS FOR PUERTO RICO PARTY V. DALMAU*)

As the First Circuit confirmed in ***Puerto Ricans for Puerto Rico Party v. Dalmau*, 544 F.3d 58, 68 (1st Cir. 2008)** (relying on *Exxon Mobil*), the doctrine does not divest a federal district court of subject-matter jurisdiction when a plaintiff presents an **independent claim**, even if that claim denies a legal conclusion reached by a state court or relates to facts addressed in state proceedings. *Dalmau*, 544 F.3d at 68.

Under *Dalmau*, because the injuries stem from the independent unconstitutional conduct of executive and municipal actors rather than from the state court judgment itself, this Court retains complete subject-matter jurisdiction.

The First Circuit vacated the lower district court's dismissal of the lawsuit, reversed an award of attorneys' fees, and remanded the case. The appeals court held that the district court erred by

dismissing the case based on an untranslated Spanish-language opinion from the Supreme Court of Puerto Rico and incorrectly applied the *Rooker-Feldman* and *res judicata* doctrines.

**CERTIFICATE OF COMPLIANCE**

This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (caption, table of contents, table of authorities, signature block, certificate), this document contains 2,728 words.

**VERIFIED FACTUAL APPENDIX IN SUPPORT OF SUPPLEMENTAL OPENING BRIEF**

I, Yaroslav Kyrpych, Appellant pro se, hereby submit this Verified Factual Appendix detailing the orchestration of the enterprise scheme, financial extraction, evidence suppression, and administrative due-process blockading that form the factual foundation of the independent constitutional torts in this action:

**DETAILED FACTUAL SUMMARY OF THE ENTERPRISE SCHEME**

1. **Initial Fabricated Allegations, Prosecutorial Clearance, and Strategic Retainer (October–November 2022)**

   Between October 21 and October 28, 2022, prior to retaining attorney Kara Carey and her firm Ryan Faenza Carey PC upon the advice and financial backing of Brian P. Divasta, Carolyn P. Gannon attempted to fabricate sexual abuse allegations against Plaintiff involving their older daughter. Gannon acted in collusion with therapist Alison Gilmore, whom Gannon had independently hired for the child.

   During a Sexual Abuse Intervention Network (SAIN) interview on October 25, 2022, the older daughter explicitly denied all sexual abuse allegations. Consequently, both the Norfolk County District Attorney's Office (Norfolk DA) and the Department of Children and Families (DCF) Waltham Area Office cleared Plaintiff of any wrongdoing.

   On October 31, 2022, Siobhan O'Malley—a relative of Assistant District Attorney (ADA) Christine McMahon Cullinan—intervened by submitting a letter in support of Gannon to DCF Waltham, which DCF response worker Axel Rivera ignored.

   Both DCF Waltham and the Norfolk DA maintained actual knowledge that Gannon and Divasta suffered from active Substance Use Disorders (SUD). Furthermore, both entities knew that Divasta possessed a felony criminal conviction for child endangerment while operating under the influence (M.G.L. c. 90, § 24V), which involved emergency hospitalization for alcohol withdrawal seizures and a suspended mandatory sentence.

Following the failure of the October 25, 2022 false sexual abuse allegations, Divasta wrote to Gannon stating that they needed to retain a lawyer who could "make the next fight the last one," asserting they possessed a sufficiently powerful support system to deliver that outcome. Financial filings disclose that Gannon expended over $150,000 on Kara Carey and Ryan Faenza Carey PC, with Divasta contributing at least $40,000.

**2. Judicial Steering, Conflicts of Interest, and Appointment of an Unqualified GAL (November 2022)**

On November 16, 2022, the Judge Lee M. Peterson of the Norfolk County Probate and Family Court appointed an unqualified Guardian ad Litem (GAL), Meghan Honigman, LICSW, from SD Family Services Inc., a firm proposed by Ryan Faenza Carey PC. SD Family Services Inc. is owned by Premela Deck, who maintains a personal relationship with Kara Carey. Judge Peterson selected Honigman over John Daignault, PsyD, a forensic child psychologist with 35 years of professional experience and over 750 GAL appointments. At the time of her appointment, Honigman had zero prior GAL appointments, with her sole clinical child experience dating back to a 2007 internship. Judge Peterson routinely channels discretionary judicial business to SD Family Services Inc.

Institutional conflicts of interest permeate this selection:

- In 2007, Kara Carey was hired as an intern at the Norfolk Probate and Family Court by her relative, former Chief Justice Paula M. Carey, and was later appointed to the Massachusetts Trial Court Child Support Guidelines Task Force in 2020 prior to Paula Carey's early retirement in 2021.
- Judge Peterson worked directly with Paula M. Carey as a case manager in the early 2000s at the Norfolk Probate and Family Court.
- Kara Carey and her firm specialize in representing clients almost exclusively before the Norfolk Probate and Family Court and were subsequently appointed as discovery masters in that venue in 2023.

Per sworn testimony from Walpole Police Department Detective Taylor Bethoney, Gannon maintained continuous, direct communication with ADAs Christine Cullinan and Anne S. Yas starting immediately after the October 25, 2022 SAIN interview. Kara Carey—who maintains a decade-long relationship with DCF and specializes in leveraging DCF administrative findings to secure favorable orders and restraining orders in Probate and Family Court—facilitated Gannon's access to DCF Waltham. DCF Waltham personnel then colluded with Gannon to fabricate an evidentiary record against Plaintiff, beginning with clinical fraud to conceal Gannon and Divasta's active substance abuse.

### 3. The January 2, 2023 Sexualized Incident, Coerced Recantation, and DCF Waltham's Misconduct

On January 2, 2023, both minor children observed Gannon and Divasta dancing naked and engaging in explicit sexual acts. On January 4, 2023, the older daughter disclosed this incident to her school guidance counselor. In response, Gannon and Divasta subjected the older daughter to verbal abuse and intimidation. Gannon violently shook the older daughter and threatened her with placement in foster care unless she recanted her statements, successfully coercing a forced recantation in Gannon's presence.

The school guidance counselor delayed filing a mandatory Section 51A report until January 12, 2023. Meanwhile, on January 9, 2023, Plaintiff brought both children to the Walpole Police Department to report the January 2 incident, of which he had been notified by the guidance counselor on January 5. Officer Michelle O'Neil documented the report, and both Detective Bethoney and ADAs at the Norfolk DA's Office were fully informed of its contents.

When the guidance counselor filed the 51A report on January 12, 2023, DCF Waltham unlawfully screened out the report. Key decision-makers—including Supervisor Laura A. Rafael, Supervisor Michelle F. Frazer, Assistant Area Director (APM) Katheryn L. Butterfield, APM Alison C. Coleman-Hardy, and APM Azelene D. Edouarzin—falsely cited that the incident had already been investigated, pointing to the cleared October–November 2022 matter.

All involved administrators knew that Gannon and Divasta suffered from active SUD, that Divasta held a felony conviction under M.G.L. c. 90, § 24V, and that DCF response worker Shannon McAnulty had stated at her deposition that the sexualized behavior observed by the children was consistent with stimulant drug intoxication.

**4. PCP Disclosure, Assigned Investigation, and Fraudulent Conduct by Elise M. Barry (January–February 2023)**

Following the coerced home recantation, Gannon arranged an unscheduled visit to the children's Primary Care Physician (PCP), Dr. Perras, on January 16, 2023, to record the recantation before a witness. However, in the presence of Dr. Perras, Gannon, and Plaintiff, the older daughter repeated her allegations regarding the January 2 sexualized incident. Dr. Perras immediately filed a 51A report containing the exact disclosures the school had submitted four days prior. DCF Waltham opened an investigation and assigned response worker Elise M. Barry.

Elise Marian Barry obtained her social worker license (LSW 315201) under her different name, Elise Marian Sullivan, concealing a criminal conviction for misdemeanor alcohol possession while intoxicated in New Hampshire *(Case No. 432-2016-CR-02916, 7th Circuit District Division – Dover, NH)*, which required substance abuse evaluation and counseling.

Despite having direct knowledge of Gannon's mental health diagnoses and prescribers, Barry intentionally concealed Gannon's active prescriptions for Schedule II (amphetamines) and Schedule IV (benzodiazepines) controlled substances, as well as her severe psychiatric profile:

- Moderate recurring Major Depressive Disorder (MDD)
- Generalized Anxiety Disorder (GAD)
- Clinical insomnia
- Attention-Deficit/Hyperactivity Disorder (ADHD)
- Formal referral to McLean Hospital

- Severe anger management issues

Both children reported to Barry that Gannon screamed at them, locked them in rooms, and that they preferred to reside with Plaintiff. Conversely, Barry confirmed that Plaintiff had no criminal history, no mental health diagnoses, and no substance use disorder, while knowing that Schedule II stimulants induce hypersexuality and sexualized behaviors of the type reported by the children.

Barry concealed Divasta's extensive polypharmacy history (involving cocaine, LSD, marijuana, opioids, and psilocybin), severe anger management issues, history of hospitalization for withdrawal seizures, and felony conviction under M.G.L. c. 90, § 24V. She further suppressed the fact that Divasta's sister had died of an alleged drug overdose, with Divasta identified as the last person in her presence on the night of her death.

During her investigation, Barry engaged in the following acts of administrative fraud:

a. Stripped all exonerating evidence provided by Plaintiff from the official administrative record.

b. Falsified the older daughter's interview statements to remove descriptions of the sexual acts observed between Gannon and Divasta.

c. Conducted private, unrecorded communications with Gannon to coordinate the 51B report, explicitly pressuring Gannon to force the older daughter to recant.

d. Received an accidental text message on her official state phone from Gannon requesting assistance after Gannon physically struck the older daughter. When Gannon subsequently reported that the child was ready to recant, Barry responded that she would simply deem the child to be lying because she could not conduct a formal re-interview.

e. Committed clinical fraud by making a formal diagnostic finding that the older daughter was "lying"—a clinical determination strictly prohibited by her LSW licensure under 258 CMR 12.03, which limits her scope to factual data collection.

f. Falsified the younger daughter's interview statements to fabricate an impression of parental coaching, while committing clinical fraud by characterizing Divasta striking the younger daughter on the arm as a "guiding motion."

g. Deliberately avoided collecting corroborating records from the school guidance counselor and concealed them from the record.

On February 8, 2023, DCF Waltham issued a supported Section 51B report alleging that Plaintiff had coached the older daughter to make false sexual abuse accusations against Gannon and Divasta. DCF Waltham unlawfully suppressed this 51B report from Plaintiff until the evening of April 5, 2023, ignoring formal requests made in February and March, and releasing it only hours before a critical Probate and Family Court hearing scheduled for April 6, 2023.

**5. DCF FSS Enrollment, Sandra Fontecchio's Role, and Staged Police Incidents (February–March 2023)**

DCF Waltham enrolled Gannon into Family Stabilization and Support (FSS) services and the First Steps Together Program, assigning ongoing DCF social worker Sandra Fontecchio (LSWA 414173). The objective was to fabricate an administrative paper trail depicting Gannon and Divasta as stable and sober, while casting Plaintiff as mentally unstable and abusive. Kara Carey directly managed and coordinated Fontecchio's administrative actions and narrative framing.

a. **February 16, 2023:** On her initial call with Gannon, Fontecchio assured her that she possessed extensive experience working with family courts and GALs.

b. **February 24, 2023:** Fontecchio filed a 51A report against Plaintiff based entirely on unverified claims relayed by Gannon, without interviewing or observing the children.

c. **March 1, 2023:** Gannon relayed identical allegations to the children's school. The school principal filed a 51A report explicitly noting that the allegations originated solely from Gannon and were never independently expressed by the older daughter during her weekly counseling sessions.

d. **March 2, 2023:** Fontecchio falsified official DCF dictation notes, claiming the children complained to her that Plaintiff was angry, unstable, and terrifying. Late that evening, Gannon brought the older daughter to the Walpole Police Department to compel her to make false sexual abuse claims against Plaintiff. The child explicitly refused, stating Plaintiff did not abuse her. Walpole PD Detective Taylor Bethoney and ADAs Cullinan and Yas reviewed this police report on March 6, 2023. Walpole PD suppressed the report from Plaintiff; it was later recovered solely through GAL files.

e. **March 11, 2023:** Following a staged incident orchestrated by Gannon, the older daughter explicitly informed a Medfield Police Officer that Plaintiff was not harming her in any way.

**6. Forced Child Isolation, Ex-Parte Separation, and Fraudulent 51A Filings (March 2023)**

Gannon repeatedly informed DCF personnel that the children would not make false sexual abuse allegations against Plaintiff unless they were completely isolated from him.

On March 12, 2023, Gannon fabricated new sexual abuse allegations over the phone to Fontecchio and scheduled an in-person meeting for March 13 at 3:00 PM to formalize them. On March 13, at approximately 11:00 AM, Gannon called PCP Dr. Perras to announce that her legal counsel, Ryan Faenza Carey PC, had coordinated DCF backing and that a court order separating Plaintiff from his children was underway. Acting on Fontecchio's explicit instructions, Gannon completely isolated the children from the outside world, keeping them locked inside her home from March 13 until March 22, 2023, when the older daughter was subjected to a SAIN interview.

At 3:54 PM on March 13, 2023, Fontecchio filed a Section 51A report. Immediately after filing, Fontecchio placed a phone call to Ryan Faenza Carey PC to confirm the submission before notifying her own DCF supervisor. During her deposition on August 2, 2024, Fontecchio initially testified under oath that the older daughter volunteered the sexual abuse claims, but when confronted with her own 51A filing, admitted she actively prompted the child using the narrative script provided by Gannon.

On March 14, 2023, armed with Fontecchio's 51A filing, Ryan Faenza Carey PC obtained an *ex-parte* order in Probate and Family Court completely separating Plaintiff from his children. DCF Waltham immediately opened a 51B investigation, assigning response worker Shannon McAnulty (LSWA). ADAs Cullinan and Yas scheduled a SAIN interview for March 22, 2023.

**7. Shannon McAnulty, Taylor Bethoney, Search Warrant Execution, and Complete Forensic Exoneration (March 2023)**

During her investigation, McAnulty concealed Gannon's active prescription for dextroamphetamine (Schedule II), later admitting under oath at her July 31, 2024 deposition that she was fully aware the drug causes hypersexuality. No independent witnesses—including school staff and medical professionals—supported the abuse allegations or claimed the children feared Plaintiff. McAnulty falsified statements from the school principal, claiming school staff reported the older daughter feared Plaintiff; the principal subsequently confirmed at deposition that Gannon was the sole source of those claims.

McAnulty admitted to working in close coordination with Norfolk DA ADAs, citing her prior five-year employment at the Norfolk DA's Office, her social friendships with ADA Cullinan and other prosecutors, and their regular post-work social drinking activities.

McAnulty attended the March 22, 2023 SAIN interview alongside Detective Bethoney and ADA Cullinan. At her deposition, Detective Bethoney admitted that the SAIN interview established only that the older daughter had been exposed to adult sexual acts. Bethoney falsely claimed ignorance regarding the perpetrators, despite having personally reviewed the Walpole Police reports from January 9, 2023 (where the child identified Gannon and Divasta) and March 2, 2023 (where Gannon attempted to force false allegations). Walpole PD falsified its official incident report to attribute the sexual exposure to Plaintiff.

At the direct instruction of ADA Cullinan, Detective Bethoney submitted a falsified search warrant affidavit to the Wrentham District Court. Detective Bethoney intentionally omitted the following material, exculpatory evidence:

a. Walpole Police Department reports dated January 9 and March 2, 2023, establishing Gannon and Divasta as the source of sexual exposure and documenting Gannon's coercion.

b. The March 13 51A report demonstrating that allegations originated from Gannon and were prompted by Fontecchio.

c. The Medfield Police Department report dated March 11, 2023, wherein the child denied any harm by Plaintiff.

d. The history of cleared false allegations originating from Gannon, including the exonerating SAIN interview on October 25, 2022.

e. An FBI database search confirming Plaintiff's complete absence of any law enforcement record.

f. The severe, undisclosed conflict of interest involving ADA Cullinan, her relative Siobhan O'Malley, and Plaintiff.

On March 29, 2023, a task force of 14 law enforcement officers—including the Massachusetts State Police Cybercrime Unit, Walpole PD detectives, regional officers, and a K-9 unit—executed a search warrant at Plaintiff's residence. Forensic examination of all electronic devices and physical premises completely exonerated Plaintiff of all four targeted offenses:

- Possession or distribution of Child Sexual Abuse Material (CSAM)
- Physical abuse of a child
- Sexual abuse of a child
- Witness tampering / intimidation of a child

The complete failure to find any incriminating evidence was communicated directly to ADAs Cullinan and Yas on the day of the search, March 29, 2023.

**8. Concealment of Search Outcome and Fabrication of the April 5, 2023 51B Report**

To preserve the basis for state intervention, the Norfolk DA's Office and Detective Bethoney deliberately declined to update the official police report with the exonerating search results. They provided this un-updated, misleading report to McAnulty to serve as the sole "evidence" supporting a Section 51B finding. McAnulty possessed actual knowledge that the forensic search yielded no evidence, explicitly noting in her 51B report that the search had occurred.

During her deposition on July 31, 2024, McAnulty testified that the decision to issue a supported 51B finding was made by her and supervisor Cheryl Banks under direct pressure from ADAs Cullinan and Yas, who falsely represented that they were actively prosecuting a criminal case against Plaintiff.

This representation was false. The Norfolk DA's Office knew no criminal case could be prosecuted because Plaintiff had been fully exonerated by the March 29, 2023 forensic search, and no probable cause existed due to six irreconcilable evidentiary flaws:

- The allegations recycled claims disproven by the October 25, 2022 SAIN interview 4.5 months prior.
- School staff confirmed the child made no disclosures during weekly one-on-one sessions.
- The severe, concealed conflict of interest involving ADA Cullinan and Siobhan O'Malley.
- Walpole PD records documenting Gannon's coercion and the child's explicit denials.
- Medfield PD records dated March 11, 2023, wherein the child denied all harm immediately prior to Gannon's new claims.
- The deliberate failure by state authorities to investigate the physical and sexual abuse claims against Gannon and Divasta from January 2023.

McAnulty formally issued her supported 51B report on April 5, 2023, while actively concealing:

- Medfield and Walpole Police reports containing the child's explicit denials.

- Newton-Wellesley Hospital medical records confirming the absence of physical injuries, bruises, or psychological distress consistent with abuse.
- The March 29, 2023 forensic search that fully cleared Plaintiff.

9. Judicial Fraud and Systemic Violations of *Adoption of Luc* (April 6, 2023)

DCF provided the February 8, 2023 51B report to Plaintiff only on the evening of April 5, 2023, following three formal demands. McAnulty's April 5 51B report was handed to Plaintiff in the courthouse hallway on April 6, 2023, merely 30 to 40 minutes prior to the hearing before Judge Peterson. Judge Peterson denied Plaintiff's motion for a continuance to review the document.

Rather than calling author Shannon McAnulty to testify, DCF presented Sandra Fontecchio. Fontecchio admitted under oath that she had not read the 51B report, but nevertheless asserted that DCF supported the sexual abuse findings and claimed the older daughter was not coached. At her August 2, 2024 deposition, Fontecchio admitted she knew at the time of her testimony that the March 29 search had exonerated Plaintiff, having been directly informed by the Norfolk DA's Office. A victim-witness advocate from the Norfolk DA's Office attended the April 6 hearing and similarly concealed the exoneration from the court.

Judge Peterson permitted Fontecchio to offer expert clinical opinion testimony that the child was "not coached," in direct violation of the Supreme Judicial Court's binding precedent in *Adoption of Luc*, 484 Mass. 139 (2020), which prohibits non-expert hearsay and uncorroborated clinical opinions in DCF reports. Fontecchio's testimony also violated her licensure restrictions under 258 CMR 12.04. Judge Peterson relied on this illegal, fabricated clinical testimony on April 6 and September 6, 2023, to deprive Plaintiff of his parental rights.

**10. Sabotage of Administrative Fair Hearing, Child Priming, and Forensic Overturn (May–September 2023)**

Plaintiff filed an administrative Fair Hearing appeal on April 5, 2023, which was scheduled for June 15, 2023. On May 15, 2023, ADAs Cullinan and Yas formally

intervened with DCF to stay the administrative hearing under the pretext of an active criminal investigation.

To create an administrative record, ADAs Cullinan and Yas colluded with Gannon to order trauma therapy for both minor children through Bay State Community Services Inc. Although Bay State initially resisted because no supported 51B report existed regarding the younger daughter—who had affirmed feeling safe and happy with Plaintiff—Bay State yielded to prosecutorial pressure. They assigned Rachael Sullivan, an unlicensed (from May 4 to August 17, 2023) and inexperienced member of the trauma team.

Sullivan generated new false sexual abuse referrals by filing 51A reports based entirely on statements from Gannon. In one 51A submission, Sullivan explicitly documented her intent, writing that she needed to ensure the allegation "gets to the DA." After DCF dismissed her first report on May 5, 2023, Sullivan filed a second report on May 15, 2023 (based on a May 11 session), falsely asserting that the younger daughter had independently disclosed abuse. DCF opened a 51B investigation and subsequently concluded the claims did not originate from the child.

On May 10, 2023, Dr. Sasha Svendsen, Chief of the Child Protection Program at UMass Memorial Health, conducted a formal forensic medical evaluation of both children. Dr. Svendsen concluded that both children were healthy and displayed zero physical or medical evidence of sexual or physical abuse. The Norfolk DA and DCF APM Katheryn Butterfield were formally notified of these exonerating findings. DCF Waltham retained clinical consultants from The Key Program Inc.—Dr. Norah Hass, PsyD, and Paula Stahl, LMHC—who reviewed the case and recommended immediately terminating Sullivan's trauma therapy, warning that it was sexualizing, clinically harmful, and that the children exhibited no indicators of abuse. DCF ignored its own experts' recommendations and permitted Sullivan to continue.

When DCF response worker Danielle Czekanski attempted to secure supported abuse findings, PCP Dr. Perras refused to assist.

On June 22, 2023, DCF issued an unsupported 51B finding regarding the younger daughter. APM Butterfield instructed social workers to provide the report to Plaintiff;

however, DCF workers Steven Ruscio and Sandra Fontecchio concealed this unsupported finding during their testimonies in Probate and Family Court on July 5 and September 6, 2023.

On August 2, 2023, ADAs Cullinan and Yas subjected the younger daughter to a SAIN interview. During the session, the child demonstrated clear evidence of being coached by Rachael Sullivan. ADA Yas halted the recording to prevent creating exculpatory evidence and formally conceded to DCF that no criminal charges would be brought against Plaintiff.

Despite this, Fontecchio concealed the negative SAIN results and the DA's decision not to prosecute during the September 6, 2023 probate hearing. Concurrently, ADA Kelly appeared in Probate Court and falsely represented that the criminal investigation was active and ongoing, despite Detective Bethoney admitting at deposition that the file was formally closed in August 2023.

On September 15, 2023, during a hearing in Wrentham District Court initiated by Plaintiff (*In the Matter of Search Warrant No. 23SW0092*), the Norfolk DA's Office admitted on the record that no evidence existed to support charges, confirmed no prosecution would occur, and assented to unsealing all search warrant affidavits and returns.

**11. Fraudulent GAL Report and Falsification of Administrative DCF Records (October–December 2023)**

In October 2023, GAL Meghan Honigman submitted her formal report to the Norfolk County Probate and Family Court, systematically suppressing exculpatory evidence while falsifying findings:

a. **Concealment of Prosecutorial Closure:** Suppressed all evidence establishing that the Norfolk DA found no evidentiary support and closed the criminal investigation without charges.

b. **Falsification of Psychological Evaluations:** Falsified the court-ordered psychological evaluation of Plaintiff conducted by Dr. Shapse to invent negative

clinical findings, going so far as to fabricate notes of a follow-up discussion with Dr. Shapse that never occurred.

c. **Inversion of Clinical Findings Regarding Gannon:** Completely inverted Dr. Shapse's clinical findings concerning Gannon, concealing her documented history of active substance abuse, misuse of prescription Schedule II amphetamines and Schedule IV benzodiazepines, severe mental illnesses, and neurocognitive impairment caused by prolonged drug and alcohol misuse. Honigman committed clinical fraud by presenting Gannon as mentally stable, despite admitting she conducted no independent diagnostic evaluation.

d. **Suppression of Forensic Medical Evidence:** Concealed Dr. Svendsen's UMass forensic evaluation that cleared Plaintiff and implicated Gannon in physical abuse against the older daughter.

e. **Concealment of Prescription Profiles and Criminal Records:** Suppressed Gannon's extensive psychiatric prescription profile and concealed Divasta's felony conviction under M.G.L. c. 90, § 24V, along with physical evidence of vehicle damage from impaired driving.

On December 20, 2023, DCF ongoing social worker Sandra Fontecchio finalized the formal DCF Family Assessment and Family Action Plan, committing severe administrative and clinical fraud:

a. **Fabricated Clinical Assessment:** Fontecchio wrote a false clinical assessment claiming Gannon was emotionally and mentally stable, directly contradicting the court-ordered psychological evaluation by Dr. Shapse, which explicitly determined that Gannon suffered from severe emotional and interpersonal dysfunction.

b. **Systematic Record Suppression:** Fontecchio intentionally suppressed and omitted critical exculpatory records provided to her, including Dr. Svendsen's UMass forensic evaluation, the exonerating search warrant results, the Norfolk DA's admissions of non-prosecution and lack of findings, the June 22, 2023

unsupported 51B report, and Dr. Shapse's psychological evaluations of both Plaintiff and Gannon.

c. **Evasion of DCF Internal Controls:** Fontecchio intentionally misspelled the names of Gannon's prescribed psychotropic medications in a highly significant manner within official state systems. This deliberate corruption of drug names was designed to bypass automated internal review software and compliance auditing mechanisms at DCF that would otherwise flag active psychotropic drug profiles.

d. **Falsification of Official Authorship:** Although the Family Assessment and Family Action Plan were formally authored, signed, and approved under the names of Steven F. Ruscio and APM Alison C. Coleman-Hardy respectively, Fontecchio subsequently admitted under oath that she was the actual sole author of both documents.

**12. Prosecutorial Non-Compliance, Suppression of SAIN Recordings, and Prolonged Administrative Sabotage (January 2024–March 2025)**

In January 2024, as part of the administrative Fair Hearing process, DCF issued an official administrative order mandating that all known SAIN interview video recordings be produced to Plaintiff by February 20, 2024.

The Norfolk DA's Office explicitly defied the administrative order and refused to release the SAIN recordings. As a direct result of the Norfolk DA's refusal to disclose this legally required forensic evidence, Plaintiff experienced four consecutive cancellations and postponements of his administrative Fair Hearings between early 2024 and March 20, 2025.

This deliberate refusal to produce the video recordings served a dual strategic objective within the enterprise scheme:

a. **Pre-Trial Concealment:** To prevent the public exposure and judicial review of exculpatory video evidence prior to the Probate and Family Court trial (which occurred between September and November 2024), thereby allowing state actors

and private counsel to fabricate and maintain a false judicial record before the court.

b. **Post-Trial Scheme Preservation:** To continuously block administrative review following the trial, ensuring that the objective video recordings could not be introduced to dismantle the underlying administrative findings and expose the broader conspiracy.

**13. Direct Judicial Intervention, Evidence Suppression, and Fabrication by Judge Lee M. Peterson**

At the final stage of the enterprise scheme, Judge Lee M. Peterson personally intervened from the bench to prevent critical exculpatory evidence from being entered into the official judicial record.

Judge Peterson actively suppressed physical and documentary evidence submitted by Plaintiff, falsified the substance and context of the limited evidence that was admitted, and independently fabricated non-existent evidence within her judicial findings and orders to preserve the legal pretext for stripping Plaintiff of his parental rights and maintaining unlawful state intervention.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that because the following pro se Appellees are not registered for electronic service by the court, I have served them via electronic mail only per mutual agreement as follows:

**Brian P. Divasta**

brian.divasta@gmail.com

**Carolyn P. Gannon**

carolyn.patricia0108@gmail.com

I further certify that because the following pro se Appellees are not registered for electronic service by the court, I have served them via regular mail:

**Anne S. Yas**

Norfolk District Attorney's Office

45 Shawmut Road

Canton, MA 02021

anne.yas@mass.gov

**Danielle Czekanski (Simmer)**

5034 N. 81st Street

Scottsdale, AZ 85250

/s/ Yaroslav Kyrpych

Plaintiff-Appellant Pro Se

Date: September 30, 2026